2022 IL App (2d) 190733
No. 2-19-0733
Opinion filed April 29, 2022

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Lake County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 18-CF-554 |
| DENNIS C. RUSSELL, | ) ) | Honorable George D. Strickland, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE McLAREN delivered the judgment of the court, with opinion.
Justices Zenoff and Hudson concurred in the judgment and opinion.

**OPINION**

¶ 1    After a jury found defendant guilty of two counts of leaving the scene of an accident involving personal injury or death, the trial court sentenced defendant to two concurrent terms of 15 years' imprisonment. On appeal, defendant argues (1) he was denied a fair trial because the trial court failed to properly answer a jury question, (2) the trial court erred by failing to grant a mistrial after a witness testified about defendant's statement that "he was afraid to go back to prison," and (3) the trial court committed plain error by sentencing him to an extended term of 15 years' imprisonment for his conviction of a Class 2 felony. For the reasons that follow, we affirm defendant's convictions and reduce defendant's sentence on the Class 2 felony to seven years' imprisonment.

¶ 2                                    I. BACKGROUND

¶ 3     On April 25, 2018, the State charged defendant in a two-count indictment with leaving the scene of an accident involving personal injury or death (625 ILCS 5/11-401(b) (West 2016)). Both counts alleged that, on or about October 21, 2017, defendant was involved in an accident on Green Bay Road in Zion, Illinois, and that he failed to report the accident to a police station within one-half hour. Count I of the indictment alleged that the accident injured Johnnie Burrell. Count II alleged that Randle Harrison died as a result of the accident.

¶ 4     The jury trial began on June 11, 2019. Jesse Glithero, the son of the owner of Clay Top, a bar in Kenosha, Wisconsin, testified that he worked at the bar the evening of October 20, 2017, into the morning of October 21, 2017. Glithero knew defendant as a regular in the bar. That evening, defendant came in around 10:18 p.m. and left around 12:02 a.m. Defendant had one beer, two tall Crown and Cokes, and a shot of Crown. Defendant drove away from the bar's parking lot in a Chrysler Sebring convertible.

¶ 5     Video from the Clay Top bar and its parking lot was admitted into evidence and published to the jury. The video showed defendant going in and out of the bar and getting into a Sebring convertible.

¶ 6     Cellphone records admitted into evidence showed that at 12:08 a.m. on October 21, 2017, defendant used his cellphone near the Pleasant Prairie Police Department. In addition, the court admitted video taken at the Pleasant Prairie Police Department into evidence. This video showed that at 12:10 a.m. on October 21, 2017, a Sebring convertible with the top lowered pulled into the police department parking lot and then drove away.

¶ 7     Burrell testified that shortly after midnight on October 21, 2017, he and Harrison left Harrison's mother's home in Pleasant Prairie, Wisconsin, to go to Walmart in Zion, Illinois. First,

Burrell and Harrison tethered a Green Machine, a children's three-wheeled riding toy, to a mountain bike. Then, Burrell and Harrison took turns riding the Green Machine and the mountain bike as they rode south on Green Bay Road toward a Walmart one to two miles away on Route 173.

¶ 8 Burrell testified that at some point, he lost consciousness, and he woke up on the grass near the side of the road. The road was unlit, and Harrison was lying in the gravel. No car had pulled off to the side of the road. No one was there to help. Burrell, unable to find a cellphone, hobbled toward a neighborhood until he found a house where someone answered the door. Then he passed out and was taken to the hospital by ambulance.

¶ 9 The parties stipulated that at 1:54 a.m. on October 21, 2017, Burrell was admitted to Vista East Medical Center. A nurse drew Burrell's blood, which revealed a blood alcohol content of 0.08.

¶ 10 Zion police officer David Gort testified as follows. On the morning of October 21, 2017, he was dispatched to a scene between "Green Bay Road and 9th Street and Route 173[.]" When Gort arrived at the scene, he checked the area for "what was described as a black male subject trying to wave down cars." A few minutes later, Gort and policer officer Casey Taylor were dispatched to Bluestone Court in a nearby neighborhood regarding a "subject outside yelling for help." When Gort arrived at Bluestone Court, Taylor reported that Burrell could not find his friend.

¶ 11 Gort testified that he then drove back to Green Bay Road to check the area. As Gort drove north on Green Bay Road, he saw a shoe on the east shoulder of the road. Then, using "auxiliary lighting," Gort saw a bike lying on the west side of the road. Gort also saw a body on the grass on the west side of the road. Photos of the scene where Gort found the body were admitted into evidence and published to the jury. Gort testified that the body was "laying [*sic*] in an unnatural

angle" and the person was unresponsive, with no pulse. No one else was at the scene, and no one approached him about the accident.

¶ 12    Shawna Lack testified as follows. On October 21, 2017, just after midnight, Lack was smoking outside the front door of Fritz's Corner bar in Zion, when she heard "a loud dragging noise." Lack stated that the noise was "a real loud scraping on the ground or something, so I looked out." Then a "small, silver car" drove into the parking lot. Something fell from the vehicle when the car hit a pothole in the parking lot. Lack walked closer to the object and saw "part of a kid's toy, a [B]ig [G]reen [M]achine." Lack knew the object because she has children, and they have a Big Green Machine. After the car hit the pothole, it parked behind a semi-truck.

¶ 13    A security-camera video from Fritz's Corner bar, beginning at 12:18 a.m. on October 21, 2017, was admitted into evidence. The footage showed (1) a convertible with the top down and headlights on drove through a bumpy parking lot and then went behind a semi-truck to park in the back of the lot; (2) at approximately 12:21 a.m., the convertible, now with its headlights off, drove away with an unidentifiable item hanging from the front of the car; and (3) the front of the car was damaged.

¶ 14    Mickael Reid, a tow-truck operator and mechanic, testified as follows. In September or October 2017, Reid bought a silver Sebring convertible with a black top. Reid offered the car to his son, but he did not want it. Before October 13, 2017, Reid sold the Sebring to his friend, Norman Russell, defendant's uncle. A few days after the sale, defendant drove the Sebring to Reid's house, and Reid installed a new battery.

¶ 15    Reid testified that, on October 22, 2017, defendant phoned Reid and asked for a ride to "his aunt's house in Antioch[.]" Reid agreed to pick up defendant, who told Reid that "he would be walking down Russell Road heading towards Antioch." As Reid drove, he saw defendant walking

down the road a "mile and a half to two miles" from the Big Oaks Golf Course. Reid testified that, when defendant got into the car, he looked "pretty shooken [*sic*] up," his eyes were puffy, he smelled of stale alcohol, and he looked "rough," "like he'd been very upset and crying." Reid asked defendant about the Sebring, and defendant told Reid that it broke down and that he had hit a deer. Reid told defendant he did not believe that defendant hit a deer. Reid testified that:

> "[Defendant] broke down hysterically crying, and he told me he thought he was hallucinating. All he seen was a bicycle he thought. He was hallucinating, seen a bicycle. He thought that he really hurt someone bad, and I agreed with him[,] and I said yeah, you did. And he said he had been drinking. He panicked and he drove away, and he said he was afraid he was going to go back to prison."

¶ 16 Defense counsel objected, and outside the jury's presence, the court sustained the objection and reprimanded the parties for failing to inform the court that the witness might disclose defendant's prior crime. When the jury returned, the court instructed them that the objection was sustained and stated, "the jury is instructed to disregard the last remark, as I previously indicated. Erase it from your mind as though it had never been spoken."

¶ 17 Reid continued to testify that he dropped off defendant in Antioch. On October 26, 2017, while working at Rogers Towing, Reid was assigned to retrieve a vehicle from a cornfield at the back of the Big Oaks Golf Course. When Reid arrived at the cornfield, he recognized the vehicle. It was the car he sold to defendant's uncle and in which he had replaced the battery for defendant. Reid testified that it was a "silver Sebring black top. And I got out and looked at it and it was the same [five-spoke rims], same car." When defendant drove the Sebring to Reid's house to have the battery replaced, the car had Wisconsin license plates. When Reid towed the Sebring from the

cornfield, it had no license plates. Reid towed the Sebring to the Zion police department with detective Glenn Luff.

¶ 18    Reid was shown photos that he identified as the Sebring as it appeared when he towed it. When Reid sold the car to defendant's uncle, it had no front-end damage. When Reid installed the new battery for defendant, the car had no front-end damage. Reid testified that he recognized an exhibit the prosecutor showed him as the "tow bill" he prepared for the Zion police department. The bill indicated the Sebring's vehicle identification number (VIN). The court admitted the towing bill into evidence without objection.

¶ 19    At this point, the court briefly excused the jury and Reid. Defense counsel told the court he "wanted to talk about making a motion for a mistrial" regarding Reid's testimony that defendant stated he was afraid he was going back to prison. The court replied that it would not grant a mistrial. However, before the jury's return, the court called Reid back into the courtroom to admonish him "to make absolutely no reference to the fact that the defendant ha[d] ever been to prison before."

¶ 20    During cross-examination, Reid testified that, after he dropped defendant off in Antioch, he did not go to the police to tell them about what defendant had done, because defendant promised Reid that he would turn himself in. While towing the Sebring to the police department on October 26, 2017, Reid did not tell Detective Luff, who was riding in the tow truck, that defendant admitted to Reid that he drove off after hitting someone. Reid testified that, during his first interview with Zion police officer Sabas Mercado on February 8, 2018, he told Mercado that he had not spoken to defendant since seeing him at Waukegan pier on Friday, October 20, 2017, before the accident. During Reid's second interview with Mercado on February 21, 2018, he told Mercado that he had a conversation with defendant about the accident while driving defendant to Antioch on Sunday, October 22, 2017, the day after the accident.

¶ 21    Officer Roger Barrette and Sergeant Adam Hyde, who were accident reconstruction experts, testified as follows. Hyde went to the accident scene, took photos, and marked evidence. Both Barrette and Hyde examined the Sebring at the Zion Police Department. Hyde opined that at the time of the accident, Burrell was on the mountain bike and Harrison was on the Green Machine. Barrette opined that the dent in the Sebring's hood resulted from a head hitting it. Hyde opined that other dents in the hood resulted from Burrell and his bicycle hitting the Sebring.

¶ 22    Barrette examined the Sebring at the Zion Police Department. The front passenger side of the hood was damaged. A bumper found at the scene of the accident came from the Sebring. Direct contact occurred on the passenger side of the car. Barrette opined that numerous car parts found at the accident scene matched the Sebring: a bumper, a wheel well, and part of a passenger-side mirror. Barrette took photos of the car and obtained DNA samples from the car.

¶ 23    Lisa Ramos, an expert in forensic DNA, testified that DNA from the blood collected from the Sebring was consistent with Harrison's DNA.

¶ 24    Dr. Mark Witeck, an expert in forensic pathology, testified as follows. Witeck performed an autopsy on Harrison. Harrison's injuries included a broken neck; 24 broken ribs; fractures to his back, rib cage, right arm, ankles, left thigh and legs; and multiple abrasions and lacerations to the head, torso, and extremities. Harrison also suffered internal injuries, including a "crushed" spinal cord, a broken lower spine, a torn aorta, lacerated lungs, a ruptured stomach, lacerated kidneys, and a severely damaged spleen.

¶ 25    Witeck testified that Harrison's injuries were depicted accurately in the autopsy photographs and a body chart that the prosecutor showed him. The trial court admitted these exhibits into evidence. The State rested.

¶ 26    Defendant moved for a directed verdict, which the trial court denied. Defendant recalled Mercado, who testified that he interviewed Reid on February 8, 2018. Initially, Reid denied that he saw defendant after October 20, 2017. After Mercado accused Reid of withholding information, Reid told Mercado about his conversation with defendant in which he admitted to hitting someone with his car. Defendant rested.

¶ 27    The court instructed the jury, in part:

> "To sustain the charge of aggravated leaving the scene of an accident involving death or personal injury, the State must prove the following propositions.
>
> First proposition, that the Defendant was the driver of a vehicle involved in a motor vehicle accident and second proposition, that the motor vehicle accident resulted in death or personal injury, and third proposition, that the Defendant knew that an accident had occurred, and *fourth proposition, that the Defendant knew that the accident involved another person,* and fifth proposition, that the Defendant failed to immediately stop his vehicle at the scene of the accident and remain at the scene of the accident until the Defendant had performed the duty to give information and render aid, and sixth proposition, that the Defendant failed to report the accident within one-half hour after the motor vehicle accident at a nearly police station or Sheriff's office[.]" (Emphasis added.)

¶ 28    During deliberations, the jury sent a note asking: "Regarding the fourth proposition that Defendant knew that the accident involved another person, is he required to know this immediately or within a defined period of time? If within a defined period of time, what is it?" The State argued that there was no defined period of time. Defense counsel argued that "the law is [defendant had] to know at the time of the accident." The trial court responded to the jury by writing on the note, "I cannot answer this question, please re-refer to the issues instruction."

¶ 29    The following day, a Friday, the jury sent a note to the court, stating that it could not reach a unanimous verdict. The trial court gave the jury a *Prim* instruction (see *People v. Prim*, 53 Ill. 2d 62, 75-77 (1972)) and told the jury to continue its deliberations. After further deliberation, about 10 hours in total, the jury sent another note stating that they were not making progress. The court sent the jury home for the weekend. The following Monday the jury deliberated for several more hours and found defendant guilty on both counts.

¶ 30    On August 14, 2019, the trial court sentenced defendant to two concurrent terms of 15 years' imprisonment. Defendant filed a timely notice of appeal on August 23, 2019.

¶ 31                                II. ANALYSIS

¶ 32                                A. Jury Question

¶ 33    Defendant argues that he was denied a fair trial because the trial court failed to properly answer the jury's question regarding whether defendant was required to know "immediately" that the accident involved another person. Defendant contends that the trial court should have instructed the jury that he could be found guilty only if he left the accident scene knowing he was involved in an accident with another person. The State counters that no error occurred because the court referred the jury its previously provided clear and complete instructions.

¶ 34    A trial court has a duty to instruct a jury that shows confusion or doubt about the law where the jury has asked an explicit question or requests clarification of the law arising from the facts. *People v. Childs*, 159 Ill. 2d 217, 229 (1994). This duty exists even in circumstances where the jury has been properly instructed. *Id.* However, under appropriate circumstances, a trial court may exercise its discretion to refrain from answering a jury's question. *People v. Millsap*, 189 Ill. 2d 155, 161 (2000). Appropriate circumstances include even when "the instructions are readily understandable and sufficiently explain the relevant law." *Id.* at 161. Initially, we must determine

whether the trial court abused its discretion in answering the jury's question. *People v. Leach*, 2011 IL App (1st) 090339, ¶ 16. Next, we must determine whether the trial court's response to the question was correct. *Id.* The second step of the analysis involves a question of law that we review *de novo*. *Id.*

¶ 35    Here, the jury asked. "Regarding the 4th proposition that the defendant knew the accident involved another person, is he required to know this immediately, or within a defined period of time? If within a defined period of time, what is it?" The trial court directed the jury to "re-refer to the issues instruction," which stated:

"To sustain the charge of Aggravated Leaving the Scene of an Accident Involving Death or Personal Injury, the State must prove the following propositions:

First Proposition: That the defendant was the driver of a vehicle involved in a motor vehicle accident; and

Second Proposition: That the motor vehicle accident resulted in a death or personal injury; and

Third Proposition: That the defendant knew an accident had occurred; and

Fourth Proposition: *That the defendant knew that the accident involved another person*; and

Fifth Proposition: *That the defendant failed to immediately stop his vehicle at the scene of the accident* and remain at the scene of the accident until the defendant had performed the duty to give information and render aid; and

Sixth Proposition: That the defendant failed to report the accident within one-half hour after the motor vehicle accident at a nearby police station or sheriff's office, giving the place of the accident, the date, the approximate time, the defendant's name and address,

the registration number of the vehicle driven, and the names of all other occupants of that vehicle[.]" (Emphases added.)

¶ 36 Section 11-401 of the Illinois Vehicle Code (625 ILCS 5/11-401 (West 2016)) is titled "Motor vehicle accidents involving death or personal injuries" and provides in relevant part:

"(a) The driver of any vehicle involved in a motor vehicle accident resulting in personal injury to or death of any person shall immediately stop such vehicle at the scene of such accident, or as close thereto as possible and shall then forthwith return to, and in every event shall remain at the scene of the accident until the requirements of Section 11-403 have been fulfilled. Every such stop shall be made without obstructing traffic more than is necessary.

(b) Any person who has failed to stop or to comply with the requirements of paragraph (a) shall, as soon as possible but in no case later than one-half hour after such motor vehicle accident, or, if hospitalized and incapacitated from reporting at any time during such period, as soon as possible but in no case later than one-half hour after being discharged from the hospital, report the place of the accident, the date, the approximate time, the driver's name and address, the registration number of the vehicle driven, and the names of all other occupants of such vehicle, at a police station or sheriff's office near the place where such accident occurred. No report made as required under this paragraph shall be used, directly or indirectly, as a basis for the prosecution of any violation of paragraph (a)." *Id.* § 11-401(a), (b).

¶ 37 In *People v. Digirolamo*, 179 Ill. 2d 24 (1997), our supreme court recognized that section 11-401 of the Illinois Vehicle Code (625 ILCS 5/11-401 (West 2016)) does not expressly refer to the required mental state. *Digirolamo*, 179 Ill. 2d at 38. However, the court explained that the State

must prove that defendant knew that his vehicle was involved in an accident (*id.* at 38-39) and that he had knowledge that the accident involved another person (*id.* at 42). See *People v. Meuris*, 2016 IL App (2d) 140194, ¶ 16. Our supreme court stated:

"[I]t is clear that the legislature enacted section 11-401 with the primary purpose of requiring a motorist involved in an accident with another person *to stop and render assistance* to the injured person. *** Because rendering assistance requires an affirmative course of action by a driver, it necessarily follows that the driver must be aware of the facts giving rise to this duty. In other words, the driver must know of the existence of an injured person. In view of the legislature's focus on requiring a driver to render aid to an injured person, we find that it is consistent with legislative intent to require that a driver have knowledge that the accident involved another person." (Emphasis in original.) *Digirolamo*, 179 Ill. 2d at 41-42.

¶ 38    Under the circumstances here, we cannot say the court's decision to answer the question by directing the jury to reread the "issues" instruction was an abuse of discretion. See *People v. Averett*, 381 Ill. App. 3d 1001, 1012 (2008) (the trial court has discretion in determining how best to respond to a jury question). The jury instruction in question here was readily understandable. It required the jury to find that defendant knew that the accident involved another person and failed to immediately stop his vehicle and render assistance. Thus, the instruction clearly required the jury to find that defendant knew that the accident involved another person at the time of the accident. So, the trial court's direction to reread the instruction was a proper answer to the jury's question. Thus, the trial court did not err in its response to the jury's question.

¶ 39    Even if the trial court had erred by failing to answer the jury's question as defendant requested, any alleged error was harmless. An instructional error is harmless beyond a reasonable

doubt if the result of the trial would not have been different had the jury been properly instructed. *People v. Washington*, 2012 IL 110283, ¶ 60.

¶ 40    Here, the evidence was overwhelming that defendant knew at the time of the accident that it involved another person. At trial, Reid testified that defendant stated he knew he hit a bicycle and thought he "really hurt someone bad," and "panicked and drove away" from the scene. Defendant also told Reid that "he was afraid he was going back to prison." Defendant struck two men. Harrison, who was riding the Green Machine, was struck first. Then about six feet further, defendant struck Burrell, who was riding a bicycle. Harrison was five-feet-eleven-inches tall and weighed approximately 160 pounds. The accident caused severe damage to the Sebring, including numerous dents to the hood, a missing bumper, a missing wheel well, a damaged lower grill, and a damaged passenger-side mirror. The accident reconstruction experts testified that the dents in the hood were consistent with impact with Harrison's head and Burrell's body. Also, DNA taken from the hood was consistent with Harrison's. Shortly after the accident, a witness sitting outside a nearby bar heard a scraping noise and saw a damaged silver Sebring convertible dragging part of a Green Machine. A damaged silver Sebring that matched the accident debris at the scene was found abandoned in a cornfield. The car's keys were inside with the license plates and all personal items removed. The vehicle identification number on the Sebring was registered to defendant.

¶ 41    Accordingly, we hold that the trial court did not commit reversible error by failing to instruct the jury that, to find defendant guilty, it had to find defendant knew at the time of the accident that it involved another person. Further, any alleged error was harmless because the evidence supporting the verdict was so clear and convincing that the verdict would not have been different had the jury been properly instructed. See *People v. Pomykala*, 203 Ill. 2d 198, 210 (2003).

¶ 42                              B. Motion for a Mistrial

¶ 43    Defendant argues that the trial court abused its discretion by failing to grant his motion for

a mistrial where a witness testified about defendant's statement that "he was afraid to go back to

prison." Defendant has forfeited his claim because, even though he objected at trial, he failed to

include it in his posttrial motion. See *People v. Sebby*, 2017 IL 119445 ¶ 48 (citing *People v.*

*Belknap*, 2014 IL 117094, ¶ 66, citing *People v. Enoch*, 122 Ill. 2d 176, 186 (1988) ("failure to

raise an issue in a written motion for a new trial results in a waiver of that issue on appeal")).

¶ 44    Ordinarily, we may review an otherwise forfeited issue for plain error under Illinois

Supreme Court Rule 615(a) (eff. Jan. 1, 1967), which permits the review of unpreserved errors

when

> "(1) a clear or obvious error occurred and the evidence is so closely balanced that the error
>
> alone threatened to tip the scales of justice against the defendant, regardless of the
>
> seriousness of the error, or (2) a clear or obvious error occurred and that error is so serious
>
> that it affected the fairness of the defendant's trial and challenged the integrity of the
>
> judicial process, regardless of the closeness of the evidence." *People v. Piatkowski*, 225 Ill.
>
> 2d 551, 565 (2007). See Ill. S. Ct. R. 615(a) (eff. Jan. 1, 1967).

Under both prongs of the plain-error doctrine, the defendant bears the burden of persuasion. *People*

*v. Hillier*, 237 Ill. 2d 539, 545 (2010). If the defendant fails to sustain his burden, we must honor

the procedural default. *Id.*

¶ 45    A defendant who fails to argue for plain-error review "obviously cannot meet his burden

of persuasion." *Id.* Specifically, "when a defendant fails to present an argument on how either of

the two prongs of the plain-error doctrine is satisfied, he forfeits plain-error review." *Id.* at 545-

46.

¶ 46    Here, defendant failed to acknowledge that he forfeited the substantive issue and, consequently, failed to provide us with a persuasive legal argument to excuse his procedural default. Thus, defendant has forfeited plain-error review of the court's denial of his mistrial motion, and we must honor the procedural default. See *id.* at 545.

¶ 47    Forfeiture aside, we are unconvinced that this was error. Defendant's comment to Reid could easily be deemed an admission of guilt. Considering the overwhelming evidence, it would not have been prejudicial.

¶ 48                                C. Sentence

¶ 49    Finally, defendant argues the trial court committed plain error when it sentenced him to 15 years for his conviction on count I, a Class 2 felony, because the maximum allowable sentence was 7 years. Defendant acknowledges that he forfeited this issue because he did not raise it below. See *People v. Reed*, 177 Ill. 2d 389, 393-94 (1997) (failure to file a motion to reconsider sentence forfeits any sentencing issue for review). However, defendant argues that it is a reversible plain error under the second prong of the plain-error doctrine. See *Hillier*, 237 Ill. 2d at 545. Although defendant seeks remand for resentencing, the State concedes that defendant's concurrent 15-year sentence on his Class 2 felony conviction should be reduced to a 7-year sentence.

¶ 50    The plain-error doctrine permits review of an otherwise forfeited error. *Id.* at 544-45; see also Ill. S. Ct. R. 615(a) (eff. Jan. 1, 1967). To obtain sentencing relief under the second prong of the plain-error doctrine in the sentencing context, a defendant must show a clear or obvious error and that "the error was so egregious as to deny the defendant a fair sentencing hearing." *Hillier*, 237 Ill. 2d at 545.

¶ 51    Section 5-8-2(a) of the Uniform Code of Corrections (Code) provides in relevant part:

"A judge shall not sentence an offender to a term of imprisonment in excess of the maximum sentence authorized by Article 4.5 of Chapter V for an offense or offenses within the class of the most serious offense of which the offender was convicted unless the factors in aggravation set forth in Section 5-5-3.2 or clause (a)(1)(b) of Section 5-8-1 were found to be present." 730 ILCS 5/5-8-2(a) (West 2016).

¶ 52    Our supreme court has held that, under section 5-8-2(a) of the Code, a defendant convicted of multiple offenses may be sentenced to an extended-term sentence for only the most serious class of offenses. *People v. Bell*, 196 Ill. 2d 343, 350 (2001); *People v. Jordan*, 103 Ill. 2d 192, 205-06 (1984). However, an extended-term sentence "may be imposed on separately charged, differing class offenses that arise from *unrelated courses of conduct*." (Emphasis in original and internal quotation marks omitted.) *Bell*, 196 Ill. 2d at 350. In determining whether the offenses were part of unrelated courses of conduct, the court must consider "whether there was a substantial change in the nature of the defendant's criminal objective." *Id.* at 354. If so, then the offenses were part of an "unrelated course of conduct," and a court may impose an extended-term sentence on differing class offenses. *Id.* at 354-55.

¶ 53    Here, defendant was convicted of two counts of leaving the scene of an accident involving personal injury or death pursuant to section 11-401(b) of the Illinois Vehicle Code. Count I did not involve death and, therefore, was a Class 2 felony offense (625 ILCS 5/11-401(d) (West 2016)), punishable with a sentencing range of 3-7 years' imprisonment for a nonextended term and 7-14 years for an extended term (730 ILCS 5/5-4.5-35(a) (West 2016)). In contrast, count II involved death and, therefore, was a Class 1 felony (625 ILCS 5/11-401(d) (West 2016)), punishable with a sentencing range of 4-14 years' imprisonment for a nonextended term (730 ILCS 5/5-4.5-30(a) (West 2016)).

¶ 54    Here, there was no substantial change in defendant's criminal objective. Defendant struck both Burrell and Harrison with his car almost instantaneously. Then he failed to stop and render assistance to the victims and failed to report the accident. Thus, defendant's course of conduct was the same, and the two offenses were not independently motivated. Therefore, an extended-term sentence for the lesser offense, count I, was improper.

¶ 55    Moreover, we find that this plain error is so egregious as to deprive defendant of his right to a fair sentencing hearing. *Hillier*, 237 Ill. 2d at 545. Accordingly, we accept the State's concession, and we reduce defendant's sentence on count I to seven years' imprisonment, the maximum nonextended-term sentence for a Class 2 felony (730 ILCS 5/5-4.5-35 (West 2016)). See Ill. S. Ct. R. 615(b)(4) (eff. Jan. 1, 1967).

¶ 56                                III. CONCLUSION

¶ 57    We affirm the judgment of the circuit court of Lake County as modified.

¶ 58    Affirmed as modified.

**No. 4-20-0666**

| | |
|---|---|
| **Cite as:** | *People v. Smith*, 2022 IL App (4th) 200666 |
| **Decision Under Review:** | Appeal from the Circuit Court of McLean County, No. 00-CF-1349; the Hon. Scott D. Drazewski, Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Catherine K. Hart, and Salome Kiwara-Wilson, of State Appellate Defender's Office, of Springfield, for appellant. |
| **Attorneys for Appellee:** | Don Knapp, State's Attorney, of Bloomington (Patrick Delfino, David J. Robinson, and Timothy J. Londrigan, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |